# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF GUAM

| | |
|---|---|
| **MAEDA PACIFIC CORPORATION**, | Civil Case No. 08-00012 |
| Plaintiff, | |
| vs. | **OPINION AND ORDER RE: MOTION FOR APPROVAL OF GOOD-FAITH SETTLEMENT** |
| **GMP HAWAII, INC.,** *et al.***,** | |
| Defendants, | |
| **AND DERIVATIVE AND OTHERWISE RELATED LITIGANTS**. | |

Before the court is Third-party Defendant Smithbridge Guam, Inc.'s "Alternative Motion for Summary Judgment, or Approval of Good-Faith Settlement, for Dismissal of the Third-Party Complaint" ("the Smithbridge motion"), and the "Motion for Summary Judgment" filed by Defendants Jorgensen & Close Associates and U.S. Speciality Insurance Company ("the J&CA motion"), insofar as the latter asserts status as a third-party beneficiary of the purported settlement referred to in the title of Smithbridge's motion. *See* Docket Nos. 69 (Smithbridge motion), 80 (J&CA motion). The court deals *only* with the settlement issue in the motions. That issue was extensively briefed and discussed in declarations. *See*, *e.g.*, Docket Nos. 69, 80, 81, 89, 90, 94, 95, 100, 104, 107, 116, 118, 120, 121. The court heard oral argument on February 4, 2010. *See* Docket No. 161. Having read the briefs and the declarations, heard the argument and the testimony, and considered it all in the light of the law, the court hereby **GRANTS** the Smithbridge motion but **DENIES** the J&CA motion, for the reasons given below.

# I. FACTUAL BACKGROUND

## A. The Project

Plaintiff Maeda Pacific Corporation ("Maeda") entered into a contract with the Naval Facilities Engineering Command ("NAVFACENGCOM"), whereby Maeda agreed to build an off-site water supply system on Guam's Andersen Air Force Base. *See* Docket No. 54 at ¶8; *id*., Exh. A at 1. This Maeda-Navy contract is hereinafter called the "primary contract," and the overall project it contemplates is hereinafter called "the Project."

In connection with its duties under the primary contract, Maeda entered into some sub-contracts. One such sub-contract was with GMP Hawaii, Inc. ("GMP"). *See* Docket No. 54, Exh. A at 1. Maeda and GMP disagree over the exact scope of this contract. Maeda contends that GMP agreed to design the large water reservoir tank contemplated by the primary contract, and to use "its best professional skill and knowledge to prepare the Plans and Specifications and other information, and the ultimate design for said tank." Docket No. 54 at ¶14. GMP denies these allegations. *See generally* Docket No. 95. Specifically, GMP states that it agreed "to provide construction quality control management, and design engineering for the Project," but that these responsibilities "did not include design of the water storage tank, and [that] the compensation paid to GMP under that contract did not include design of the water storage tank." Docket No. 98 at ¶¶2, 4. The actual contract simply appears to call for "DESIGN," "QUALITY CONTROL," and "VALUE ENGINEERING." Docket No. 54, Exh. A at 1; Docket No. 98, Exh. A at 1 (same document). At any rate, the price of that contract, after a few change orders, was $1,555,966.70. Docket No. 54 at ¶9.

Another of Maeda's sub-contracts was with Smithbridge Guam, Inc. ("Smithbridge"). As with the Maeda-GMP contract, Maeda and Smithbridge appear to disagree over the exact scope of their contract. Maeda contends that Smithbridge agreed to build the reservoir tank and its "appurtenant sections." Docket No. 54 at ¶10. Smithbridge appears to deny this, insofar as it asserts that "'tank appurtenances' . . . [were] outside Smithbridge's contractual scope of work." Docket No. 71, Exh. 2 at 1. *See also* Docket No. 92, Exh. A, Exh. 3 at 2-4.

In connection with the just-discussed Maeda-Smithbridge sub-contract, Smithbridge entered into a contract with Jorgensen & Close Associates, Inc. ("J&CA") for structural engineering design services. *See* Docket No. 82, Exh. A. Specifically, J&CA's work was to include (1) structural design and drawings for the membrane floor and "precast-prestressed" wall of the reservoir tank; (2) a review of the roof and column design and drawings prepared by Smithbridge; (3) internet consultations, a shop drawing review, and up to two field observation trips to Guam; and (4) any other services requested by Smithbridge and agreed to by J&CA. *Id*.

On July 12, 2007, the roof of the reservoir tank collapsed. *See* Docket No. 54, Exh. B at 3. There is controversy over the cause of the collapse. Maeda contends that the collapse was caused by the absence of vents, ventilating systems or ventilators in the tank. *See* Docket No. 54 at ¶¶20-21; *see also id*., Exh. B (expert report prepared by Wiss, Janney, Elstner Associates, Inc., for Smithbridge). However, GMP points out that NAVFACENGCOM commissioned its own forensic study of the incident, and that this study came to the conclusion that, in GMP's words, "operational errors could have been the cause for the collapse." Docket No. 98 at ¶18; *see also id.*, Exh. G (expert report prepared by Weidlinger Associates Inc. for NAVFACENGCOM). More to the point, and separate from the controversy over the *cause* of the collapse, there is controversy over who has *responsibility* for whatever caused the collapse. That controversy over responsibility constitutes this lawsuit.

**B. The Purported Smithbridge-Maeda Settlement**

Smithbridge claims to have reached a settlement with Maeda. The evidence on this point is as follows.

- On September 6, 2007, Albert Smith, Managing Director of Smithbridge, sent a letter to Tom Nielsen, President of Maeda. *See* Smithbridge Hearing Exh. 3-A ("the Smith-Nielsen letter"). In the Smith-Nielsen letter, Smith states that the "forensic engineer's final report on the cause of the failure" has been completed. *Id*. at 1; *see also* Docket No. 92 at 12-24 (report). Smith calls the report "conclusive," and states that "it indicates that the roof collapsed because of severe

overloading from the vacuum under the roof on top of the water when the water surface level was lowered"—a vacuum only made possible by "the lack of ventilation of the air cavity on top of the water surface in the tank." Smithbridge Hearing Exh. 3-A at 1. Smith states that his team "investigated the records and communication files for the project to determine why there were no vents and where the responsibility for the design and installation of the vents rested." *Id*. Smith then details the results of that investigation and concludes that Smithbridge (and, possibly by extension, its designer, J&CA) cannot be faulted for the collapse. *See id*. at 1-2. Nonetheless, Smith states that Smithbridge will absorb (1) the cost of the forensic engineer's report (by then completed), and (2) the cost of the demolition and removal of debris (by then already under way). *See id*. at 2-3. Smith then explains that the offer is "without prejudice," and constitutes "an attempt to show our pro-active approach to arranging a speedy start for the diagnostic and demolition phases." *Id*. at 3. Finally, Smith states that "[i]f during the execution of the demolition, the situation progresses toward legal action against Smithbridge or any other parties, we reserve the right to present the costs incurred for re-imbursement from the party ultimately responsible." *Id*.

- On September 14, 2007, Smithbridge sent a letter to Maeda, in which it laid out its "proposal for the inspection, demolition, ventilation design and roof reconstruction of the water tank at AAFB." Docket No. 71, Exh. 3 ("the Proposal"). In keeping with the Smith-Nielsen letter, the Proposal indicated that Smithbridge would be responsible for cost items 1 ("Condition Survey" or "Forensic Engineer") and 3 ("Demolition"), if Maeda were to agree to the "commercial terms" explained in the Smith-Nielsen letter. *Id*. The total value of cost items 1 and 3 was $423,633.50. *See id*.

- On September 25, 2007, Maeda's counsel wrote to Smithbridge to make clear that Maeda "look[ed] to [Smithbridge] to indemnify, hold harmless and defend

[Maeda] and its surety in connection with [the collapse of the roof structure]." Docket No. 71, Exh. 1 ("the Smithbridge Demand letter").

- On October 8, 2007, Smithbridge's counsel answered Maeda's counsel. *See* Docket No. 71, Exh. 2 ("the Smithbridge Answer letter"). In the Smithbridge Answer letter, Smithbridge denied any liability for the collapse of the roof structure and declined Maeda's demand. *See id*. Smithbridge stated that it had already "incurred considerable expenses for the additional work of cleaning up the collapsed roof and employing a forensic engineer to issue a report of its cause." *Id*. Smithbridge also stated that, "[i]n the spirit of cooperation," it was still "willing to absorb these additional incurred expenses if [Maeda] would agree to the terms of the remediation proposal." *Id*. As an inducement, Smithbridge asserted that it was "prepared to pull off the project and hold [Maeda] accountable for the additional expenses already incurred in this unfortunate mishap." *Id*. In closing, Smithbridge requested that "your letter of September 25, 2007 [*i.e.*, the Smithbridge Demand letter] be formally withdrawn." *Id*.

- On October 24, 2007, Maeda's counsel replied to the Answer letter. *See* Docket No. 71, Exh. 4 ("the Withdrawal letter"). In the Withdrawal letter, Maeda's counsel first thanked Smithbridge for "coming to my office last week and meeting with Tom Nielsen of [Maeda] and myself [*sic*] to discuss strategy and techniques for finalizing the repair of the roof for the *Andersen Air Force Base* water tank." *Id*. (emphasis in original). Maeda then wrote: "In accordance with your request, [Maeda] hereby withdraws [the Smithbridge Demand letter], because you have agreed to continue to work on the repair and replacement of the roof in accordance with [the Proposal]. Maeda hereby accepts that proposal." *Id*.

- On April 8, 2008, Maeda's Willy Flores sent an email to Smithbridge's Hernan Bonsembiante. *See* Maeda Hearing Exh. M-1 ("the Flores email"). Flores noted that, at the time, the total balance that Maeda owed to Smithbridge amounted to

Page 5 of 20

1 | $1,314,302.37—$1,150,302.37 for the repair contract, plus a $164,000 balance on "the previous contract." *Id*. at 1. Flores then proposed that Maeda be permitted to discharge that balance by a payment of $1 million, with the $314,302.37 differential being "for settlement." *Id*.

- On April 14, 2008, Smithbridge held a meeting with Maeda, and created minutes to memorialize it. *See* Docket No. 101, Exh. A ("the Minutes"). The agenda of the meeting was to discuss the Flores email, in which Maeda "request[ed] additional discount for the tank project at AAFB and in consideration for the additional discount [Maeda] will 'remove all liability from [Smithbridge] for the collapse.'" *Id*. The Minutes indicate that Tom Nielsen "reiterated [that Maeda's] position has not changed and [that Maeda] has no intention of pursuing [Smithbridge] legally now or at any time in the future for compensation related to the roof collapse on the tank." *Id*. Nielsen also "reassured [Smithbridge] that [Maeda's] position is still the same . . . *i.e.*, that [Maeda] will not pursue legal action against [Smithbridge] for any compensation relating to the collapse of the tank roof." *Id*. Steve Radonich, Smithbridge Vice President, indicated that "[Smithbridge] will assist with documentary evidence to support [Maeda] in any suit against others for the collapse of the tank roof if [Maeda] pursues others who may be at fault." *Id*. The Minutes summarized "the essence of the agreement" that had been reached in an earlier meeting between the parties:

    > [Maeda] to complete their contract satisfactorily, remove or at least minimize any further cost exposure to Maeda i.e. LD's for late delivery and remove the customer from the equation. This agreement also allowed for establishing the exact cost [Maeda] suffered and to enable them to move forward with bringing suit against others or their insurers with a definite cost of the claim clearly established.

    *Id*. However, Radonich also "indicated that the terms of payment outlined in [Maeda's] request are unsatisfactory," and "agreed to further approach Albert Smith to discuss the discount request." *Id*.

1     •     On April 15, 2008, Radonich (of Smithbridge) emailed the Minutes to Nielsen (of Maeda) for his comments. *See* Docket No. 101, Exh. B. Radonich indicated that he would require a substantial progress payment from Maeda in order to discuss the discount request with Smith, "as last time we spoke he was very unhappy." *Id*. Then, on April 16, 2008, Nielsen replied to Radonich, indicating that the only changes he thought necessary pertained to (1) his title, and (2) the value of the insurance claim Maeda intended to lodge against "the tank designer." *Id*.

•     Finally, about one or two months after the April 14, 2008 meeting, Smithbridge granted Maeda a discount of $122,065.81. *See* February 4, 2010 Hearing; *see also* Docket No. 69. However, this discount was applied to the original Smithbridge-Maeda contract, not the repair contract. *See* February 4, 2010 Hearing; *see also* GMP Hearing Exh. GMP-1 (cost breakdown prepared by Smithbridge's Jake Leon Guerrero and Hernan Bonsembiante, showing $122,065.81 in total discounts under "Original Contract" and none under "Repair").

Adding the $423,633.50 of "without prejudice" work from the Proposal with the $122,065.81 discount given after the April 14, 2008 meeting, Smithbridge claims that the "total settlement value" was $545,699.31. Docket No. 69 at 1:26.

Maeda, for its part, states that "[it] never executed a settlement agreement or release of claims with either Smithbridge or [J&CA] related to the damaged water tank," that "[it] did not intend for its acceptance of Smithbridge's proposal to repair the damaged water tank on the Project to constitute a settlement of all claims against either Smithbridge or [J&CA]," and that "[it] never stated or in any way indicated that it had or would settle or release any of its claims against Smithbridge related to the Project." Docket No. 121 at 3:13-20.

However, during the hearing, Maeda modified its position: its president and its counsel both admitted that Maeda had, at some point, agreed with Smithbridge that it would not sue Smithbridge. *See* February 4, 2010 Hearing.

**C.     The Purported J&CA-Maeda Settlement**

J&CA also claims to be a third-party beneficiary of the purported Smithbridge-Maeda settlement. The evidence on this point is as follows.

- On September 25, 2007, Maeda's counsel sent J&CA a letter quite similar to the Smithbridge Demand letter. *See* Docket No. 124 at 5 ("the J&CA Demand letter"). In the J&CA Demand letter, Maeda's counsel stated that Maeda "look[ed] to [Smithbridge] to indemnify, hold harmless and defend [Maeda] and its surety in connection with [the collapse of the roof structure]." *Id*.

- On October 23, 2007, J&CA responded to Maeda. *See* Docket No. 124 at 15 ("the J&CA Response"). In its response, J&CA explained that "[w]e have not responded until now, as we understood that as a consultant to Smithbridge . . . that our interests were being represented through them." *Id*. J&CA also stated that it

    > . . . further understands that Smithbridge and Maeda have reached an agreement, and that Maeda is no longer looking to Smithbridge to "hold harmless and defend MPC" in this matter. Rather, J&CA understands, Maeda is now looking to Smithbridge to assist them in rehabilitating the tank. As soon as J&CA receives word that Maeda is no longer looking at J&CA as part of the problem, but rather part of the solution, J&CA will resume assisting Smithbridge and Maeda in designing the remedial measures for the tank.

    *Id*.

- Finally, there was testimony at the hearing that Smithbridge and Maeda had discussed J&CA during their settlement-related discussions, insofar as Smithbridge emphasized the importance of keeping J&CA on the project to avoid onerous reverse-engineering costs. *See* February 4, 2010 Hearing. However, there was also testimony that any such discussion was never understood, on Maeda's part, to amount to a release of potential claims against J&CA. *See* February 4, 2010 Hearing.

Again, in its papers, Maeda states that "[it] never executed a settlement agreement or release of claims with . . . [J&CA] related to the damaged water tank," that "[it] did not intend

for its acceptance of Smithbridge's proposal to repair the damaged water tank on the Project to constitute a settlement of all claims against . . . [J&CA]." Docket No. 121 at 3:13-18.

## II. PROCEDURAL BACKGROUND

Maeda initiated this case by filing its initial complaint on August 14, 2008. *See* Docket No. 1. The defendants named in the initial complaint were: GMP; Ohio Pacific Tech, Inc. ("Ohio Pacific"); GMP Associates, Inc.; and J&CA. *Id*.

On October 14, 2008, GMP and Ohio Pacific answered the complaint, and brought a counterclaim for breach of contract against Maeda, and a cross-claim for contribution against J&CA. *See* Docket No. 16. That same day, GMP and Ohio Pacific also brought a third-party complaint for contribution against Smithbridge. *See* Docket No. 17.

On November 3, 2008, Smithbridge answered the third-party complaint, and brought a counterclaim[1] against GMP and Ohio Pacific, as well as a cross-claim for breach of contract against J&CA. *See* Docket No. 25. That same day, J&CA answered the GMP and Ohio Pacific cross-claim, and brought its own cross-claims for contribution and equitable indemnity against GMP and Ohio Pacific. *See* Docket No. 26.

On November 24, 2008, J&CA answered the Smithbridge cross-claim, and cross-claimed for contribution and equitable indemnity against Smithbridge. *See* Docket No. 31.

On February 24, 2009, Maeda filed its First Amended Complaint ("FAC"), the now-operative complaint. *See* Docket No. 54. The defendants named in the FAC are: GMP; Ohio Pacific; Lexington Insurance Company, the insurers of GMP and Ohio Pacific; J&CA; and U.S. Specialty Insurance Company ("Specialty"), J&CA's insurers. *Id*. Maeda asserts a negligence claim against all Defendants (Count One), a breach of contract claim against all Defendants (Count Two), and an additional breach of contract claim against GMP only (Count Three). *See id*. at 5-7. Maeda seeks a damages award of $6 million on Counts One and Two (against all named Defendants), and a further damages award of $1.8 million on Count Three (against GMP

---

[1] Unspecified, but apparently for sums due on an unjust enrichment theory. *See* Docket No. 25 at 5:8-23.

only). *See id*. at 7:2-6.

On August 14, 2009, Smithbridge filed the Smithbridge motion. *See* Docket No. 69.

On September 10, 2009, J&CA and Specialty filed the J&CA motion. *See* Docket No. 80.

On September 24, 2009, and pursuant to stipulation of the parties, the court ordered that the Smithbridge and J&CA motions be briefed on the same schedule, because they raise very similar issues. *See* Docket Nos. 84, 88. Pursuant to that order, Maeda filed its oppositions to the J&CA motion and the Smithbridge motion on October 1, 2009. *See* Docket Nos. 89, 90. GMP filed its oppositions to the two motions on that same day. *See* Docket Nos. 94, 95. On October 8, 2009, Smithbridge filed its reply to the Maeda and GMP oppositions. *See* Docket No. 100. J&CA/Specialty replied to the GMP opposition on October 8, 2009, and replied to the Maeda opposition on the following day. *See* Nos. 104 (reply to GMP), 107 (reply to Maeda).

On December 3, 2009, Smithbridge and J&CA/Specialty filed supplemental declarations. *See* Docket Nos. 116, 118. Maeda replied to the J&CA/Specialty declaration on December 10, 2009, together with its own supplemental declaration. *See* Docket Nos. 120, 121. On December 14, 2009, J&CA/Specialty filed another supplemental declaration. *See* Docket No. 124.

On December 23, 2009, Maeda moved to extend the deadline to amend its complaint, and moved for leave to file a second amended complaint. *See* Docket Nos. 135, 136. However, in the face of opposition, Maeda later withdrew these particular motions. *See* Docket Nos. 140, 141, 151.

Pursuant to the court order, the parties began filing proposed certification orders, and objections thereto, on January 11, 2010. *See* Docket Nos. 145, 148, 150, 152, 153, 155, 156, 158.

Finally, on February 4, 2010, the court held a hearing on the good-faith settlement issue. *See* Docket No. 161.

1  **III.  JURISDICTION AND VENUE**

2  All of Plaintiff's causes of action are within the court's diversity jurisdiction. *See* 28

3  U.S.C. § 1332; *see also* Docket No. 54 at ¶¶1-7.

4  Venue is proper in this judicial district, the District of Guam, because Defendants conduct

5  business here, and because all of the events or omissions giving rise to Plaintiff's claims occurred

6  here. *See* 28 U.S.C. § 1391.

7  **IV.  APPLICABLE STANDARDS**

8  The court is sitting in diversity, so it applies Guam substantive law but federal procedural

9  law. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 426-28 (1996).

10  The instant issue is governed by Section 24606 of Title 7, Guam Code Annotated. *See*

11  Docket No. 111. There do not appear to be any Guam cases applying Section 24606. But under

12  Guam law, a California case is persuasive when (1) the instant Guam case involves interpretation

13  and construction of a Guam statute, (2) the Guam statute is based on a California statute, which

14  is interpreted and applied in the California case, and (3) there is no compelling reason to deviate

15  from California's interpretation. *See O'Mara v. Hechanova*, 2001 Guam 13 ¶ 8 n.1; *Fajardo v.*

16  *Liberty House Guam*, 2000 Guam 4 ¶ 17. On that point, this court's Appellate Division observed

17  that Section 24606 is based on Section 877.6 of the California Code of Civil Procedure, and

18  sought guidance in construing an aspect of Section 24606 in a California case construing Section

19  877.6. *See Yusen Air & Sea Servs. (Guam), Inc. v. Sup. Ct. of Guam*, Civ. Nos. 93-00020A & -

20  21A, 1993 WL 245645, at *6 (D. Guam App. Div. June 23, 1993) (citing *Tech-Bilt, Inc. v.*

21  *Woodward-Clyde & Assoc.*, 698 P.2d 159 (Cal. 1985)). As such, the court will consider relevant

22  California cases, such as *Tech-Bilt*, applicable to its analysis of Section 24606.

23  **V.  ANALYSIS**

24  Smithbridge claims to have reached, with Maeda, a good-faith settlement within the

25  meaning of Section 24606, while J&CA claims to be a third-party beneficiary of any such

26  settlement. *See generally* Docket Nos. 69, 80.

### A. Smithbridge and Maeda

With respect to Smithbridge, there are two basic issues: first, whether there exists a Smithbridge-Maeda "settlement" within the meaning of Section 24606; second, if such a settlement does exist, whether its terms are consistent with "good faith" within the meaning of Section 24606.

#### 1. There exists a Smithbridge-Maeda "settlement" within the meaning of Section 24606

Section 24606 is part of Guam's "Contribution Among Joint Tortfeasors Act" ("CAJTA"). *See* 7 G.C.A. § 24601. Under CAJTA, a "settlement" within the meaning of Section 24606 is "a release *or* covenant not to sue or not to enforce judgment." 7 G.C.A. § 24605 (emphasis added); *see also* RESTATEMENT (SECOND) OF CONTRACTS §§ 284, 285 (1981) (on the distinction between a release and a covenant, or contract, not to sue).[2]

Here, the opposing parties actually agree that there was an agreement. Smithbridge's counsel maintained, during the hearing, that there was "certainly" a covenant not to sue, and elicited testimony to that effect. February 4, 2010 Hearing.

More surprisingly, and in contrast with its papers, Maeda admitted the same. Its counsel made the following offer of proof as to what its chief witness, Maeda President Tom Nielsen, was going to say: "He said, 'I have no intention of suing you now, and I will not sue you in the future, but I want a decent discount out of this agreement.'" February 4, 2010 Hearing. Nielsen was equivocal; he both admitted and denied several times that he had agreed with Smithbridge that Maeda would not sue them. *See id*. For example, when asked on cross-examination whether his testimony was "that you agreed, that you reached an understanding with Smithbridge that you would not sue them, or hold them liable, for damages as a result of the collapse of the roof tank," Nielsen replied: "That was my intent." *Id*. But a minute or two later he denied having made any

---

[2] Section 24605 posits the *legal effect* of "a release or covenant not to sue or not to enforce judgment" that is "given in good faith," while Section 24606 establishes the *procedure* for determining whether a "settlement" has been reached in good faith. *See* 7 G.C.A. §§ 24605, 24606. As the more substantive of the two provisions, Section 24605 is fairly and naturally read as specifying what counts as a "settlement" under CAJTA.

such agreement. *See id.* Ultimately, however, Nielsen agreed with the court that his "agreement and intention, as reflected in the minutes, was 'we don't want to go after you [Smithbridge] for the collapse of the roof, we won't pursue legal action.'" *Id.* Then, in closing argument, Maeda's counsel admitted that there was an agreement between Smithbridge and Maeda, stating that he would have "no credibility with [the court] at all" were he to maintain otherwise. *Id.* Maeda's counsel also said that "[t]here's no question, your Honor, that from the testimony, and from the memorandum, and from Mr. Nielsen's reply, that if he was going to dispute that he said we are not going to sue Smithbridge, as opposed to these others, he would have said, 'I didn't agree to it.'" *Id.* The sum and substance of all this, the court finds, is that Maeda agreed not to sue Smithbridge for damages related to the collapse of the tank roof, and that it expected something in return. Moreover, the court cannot see any difference between this agreement—particularly as described by Maeda's counsel—and a covenant not to sue.[3] *See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 285 (1981).

Therefore, the parties *agree* that there was a covenant not to sue. And since a "settlement" within the meaning of Section 24606 may be "a release *or* covenant not to sue," there exists a "settlement" within the meaning of Section 24606. 7 G.C.A. §§ 24605, 24606.

### 2. The Smithbridge-Maeda settlement is in "good faith" within the meaning of Section 24606

Having found that there exists a "settlement" within the meaning of Section 24606, the court must decide whether its terms are consistent with "good faith" within the meaning of the same section. A settlement is not in good faith "if it is made for significantly less than *the reasonable value of the claim for which it is made* taking into account the likelihood of liability, assets and insurance available to pay the claim, the cost and difficulty of pursuing the claim, the relationship between the parties to the settlement, and such other factors as the court may deem

---

[3] Throughout the hearing, Maeda's counsel repeatedly stressed the difference between a settlement or release, on the one hand, and a covenant or agreement not to sue, on the other. *See* February 4, 2010 Hearing. While the court understands the distinction, it is, as stated above, irrelevant under CAJTA.

appropriate or relevant." 7 G.C.A. § 24606(e) (emphasis added). As such, the first order is to determine the value of the settlement, so as to compare it to "the reasonable value of the claim for which it is made."

### a. The value of the settlement is $122,065.81

Smithbridge argues that the agreement's value was $545,699.31. *See* Docket No. 69 at 1:26. As stated earlier in this order, Smithbridge appears to have obtained this figure by adding the $423,633.50 of "without prejudice" work from the Proposal with the $122,065.81 discount given after the April 14, 2008 meeting.

The court rejects Smithbridge's valuation. Specifically, the court rejects the inclusion of the $423,633.50 of "without prejudice" work in the total value of the agreement, for a number of reasons. (For ease of reference, the court hereinafter refers to the offer of "without prejudice" work as "the incentive offer.")

- Smithbridge freely volunteered the incentive offer, before Maeda sent its demand letter. *Compare* Smithbridge Hearing Exh. 3-A (the Smith-Nielsen letter, dated September 6, 2007) *with* Docket No. 71, Exh. 1 (the Smithbridge Demand letter, dated September 25, 2007). Put differently, the incentive offer did not arise from negotiation or exchange. It looks more like a gift, which does not create enforceable obligations.

- The Smith-Nielsen letter explains the incentive offer as "an attempt to show our pro-active approach to arranging a speedy start for the diagnostic and demolition phases." Smithbridge Hearing Exh. 3-A. This vague language does not suggest any sort of expectation of bargain or exchange, and so fails to connect the incentive offer to a settlement. Moreover, the letter also states that "[i]f during the execution of the demolition, the situation progresses towards legal action against Smithbridge *or any other parties*, we reserve the right to present the costs incurred for reimbursement from the party ultimately responsible." *Id*. (emphasis added). Thus, the incentive offer was not really "free," but rather offered as a sort of

credit, insofar as Smithbridge explicitly reserved its right to ultimately demand payment for it—even if Smithbridge itself were never sued. Indeed, Smithbridge may still recover the costs of the incentive offer "from the party ultimately responsible."

- The Smithbridge Answer letter reaffirms Smithbridge's willingness to "absorb" (or at least advance) the costs of the incentive offer, "[i]n the spirit of cooperation." Docket No. 71, Exh. 2 at 2. Again, this language is too vague to connect the incentive offer with any process of negotiation or exchange, such as might give rise to a "settlement" under CAJTA.

- The Withdrawal letter does *not* say that Maeda is withdrawing its earlier demand *because of* the incentive offer; in fact, the Withdrawal letter does not mention the incentive offer *at all*. *See* Docket No. 71, Exh. 4. Rather, the Withdrawal letter says that Maeda is withdrawing its earlier demand "because you have agreed to continue to work on the repair and replacement of the roof in accordance with your September 14, 2007 letter to [Maeda]." *Id*. This suggests that Maeda did not view the incentive offer as a part of any process of negotiation or exchange.

- The Flores email does not mention the incentive offer. *See* Maeda Hearing Exh. M-1.

- On April 14, 2008, Smithbridge and Maeda met to discuss the Flores email, in which Maeda proposed a $314,302.37 discount in exchange for a promise to "remove all liability from [Smithbridge] for the roof collapse." Docket No. 101, Exh. A. The fact that Smithbridge even entertained a meeting with Maeda to discuss the proposal in the Flores demonstrates that Smithbridge did not believe, at the time, that it had obtained any settlement, release, or covenant not to sue. This, in turn, suggests that Smithbridge did not regard the incentive offer as consideration for anything. Moreover, the description of "the agreement previously reached"—authored by Smithbridge, and mentioning no consideration,

which suggests mere terms or an agreement not yet with legal effect—does not mention the incentive offer. *See id*. This further suggests that Smithbridge did not regard the incentive offer as consideration for anything, and further deters the court from doing so.

In short, the $423,633.50 of "without prejudice" work looks more like a goodwill gesture, designed to perpetuate a business relationship, than consideration. It was freely given, it was not bargained for, and it was never clearly identified as any kind of *payment* for the guarantee that Smithbridge sought. Thus, the court will not include it in the value of the settlement.

Maeda, for its part, argues that the value of the settlement is only $12,884.42, insofar as it contends that this was the value of the discount ultimately resulting from the Flores email. *See* Maeda Hearing Exh. M-2. Further, Maeda President Tom Nielsen stated during the hearing that he was unsure how Smithbridge arrived at the figure of $122,065.81 as a value of the discount resulting from the Flores email. *See* February 4, 2010 Hearing.

The court rejects Maeda's valuation as well. On cross-examination, Nielsen clarified things: he stated that Smithbridge did give Maeda a more substantial discount, but that it was applied to the balance on the original construction contract, rather than to that of the repair contract. *See* February 4, 2010 Hearing (Court: "In reality, there was some kind of exchange or debiting on the original contract?" Nielsen: "Yes.") (Tarpley: "They gave you, they gave you the discount, pursuant to your request for an additional discount because you were bleeding and hurting badly, they gave you that discount, and on the books it was taken off the balance of the original contract that you owed them?" Nielsen: "Correct."). This is borne out by the documentary evidence. *See* GMP Hearing Exh. GMP-1 (cost breakdown prepared by Smithbridge's Jake Leon Guerrero and Hernan Bonsembiante, showing $122,065.81 in total discounts under "Original Contract" and none under "Repair"). A $122,065.81 discount is a discount, regardless of accounting chicanery— and, moreover, it is valuable consideration.

In short, Maeda's position is disingenuous. The value of the settlement is $122,065.81.

## 2. A $122,065.81 settlement of Maeda's potential claim against Smithbridge is in "good faith" within the meaning of Section 24606

Again, settlement is not in good faith "if it is made for significantly less than the reasonable value of the claim for which it is made taking into account the likelihood of liability, assets and insurance available to pay the claim, the cost and difficulty of pursuing the claim, the relationship between the parties to the settlement, and such other factors as the court may deem appropriate or relevant." 7 G.C.A. § 24606(e). The inquiry should turn on

> . . . a rough approximation of plaintiffs' total recovery and the settlor's proportionate liability, the amount paid in settlement, the allocation of settlement proceeds among plaintiffs, and a recognition that a settlor should pay less in settlement than he would if he were found liable after a trial. Other relevant considerations include the financial conditions and insurance policy limits of settling defendants, as well as the existence of collusion, fraud, or tortious conduct aimed to injure the interests of nonsettling defendants. Finally, practical considerations obviously require that the evaluation be made on the basis of information available at the time of settlement.

*Tech-Bilt*, 698 P.2d at 166-67 (citation omitted). In short, "[t]he ultimate determinant of good faith is whether the settlement is grossly disproportionate to what a reasonable person *at the time of settlement* would estimate the settlor's liability to be." *City of Grand Terrace v. Sup. Ct. (Boyter)*, 238 Cal. Rptr. 119, 126 (Cal. Ct. App. 1987) (emphasis added).

Here, the $122,065.81 settlement was reached in "good faith" within the meaning of Section 24606. First, the evidence shows that, *at the time of the settlement*, Maeda did not believe it had a valuable or even viable claim against Smithbridge. For example, Maeda President Tom Nielsen indicated during the hearing that, at the time of the April 14, 2008 meeting, Maeda thought that Smithbridge "had nothing to do" with the cause of the tank roof collapse. *See* February 4, 2010 Hearing.[4] Likewise, in its "Motion for Leave to File Second Amended Complaint," Maeda stated that it did not originally sue Smithbridge because, at the

---

[4] As a follow-up, the court asked Nielsen whether it was his understanding that Smithbridge's liability would be "zero," to which Nielsen answered, "No." February 4, 2010 Hearing. This then prompted the court to ask Nielsen why, in that case, he said he would not pursue Smithbridge legally; Nielsen answered, "We had the feeling that the main fault was with the designer of record." *Id*.

time it brought this case in August of 2008, Maeda "believ[ed] GMP and [JC&A] to be the only parties with design responsibility for the reservoir tank and its appurtenances, including the tank's roofing system." Docket No. 136 at 4:19-22; *see also id*. at 6:3-6 ("As noted above, Maeda previously believed the responsibility for the water reservoir tank design to rest primarily with GMP (as the Project designer maintaining overall design review responsibility for the Project) and [J&CA] (as the designer of the water tank reservoir, specifically)."). Thus, Maeda's *own representations* show that, "on the basis of the information available at the time of settlement," *Tech-Bilt*, 698 P.2d at 167, Maeda must have thought that any Project-related legal claim it had against Smithbridge was worth little or nothing. Second, even if Maeda believed, at the time, that any Project-related legal claim it had against Smithbridge had a value over $122,065.81, a certain discount is expected—and consistent with good faith—given that "a settlor should pay less in settlement than he would if he were found liable after a trial." *Id*. at 166. Third, that discount is expected to be greater where, as here, the settlor was "uninsured, or underinsured." *Id*.; *see also* February 4, 2010 hearing (Steve Radonich testimony that Smithbridge lacks insurance coverage). Fourth, "collusion, fraud, or tortious conduct" is extremely unlikely here, since Maeda fought Smithbridge every step of the way since Smithbridge filed its motion; the two parties are simply not in concert. *Id*. at 166.

For these reasons, the $122,065.81 settlement was reached in "good faith," within the meaning of Section 24606.

**B.     J&CA and Maeda**

Having found that Smithbridge and Maeda reached a good-faith settlement within the meaning of Section 24606, the court must determine whether J&CA is a third-party beneficiary of that settlement.

"A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." 18 G.C.A. § 85204. However, as J&CA itself pointed out, the "basic presumptions" regarding intended beneficiaries are: (1) parties are presumed to have contracted only for their own benefit, and (2) where there is doubt about

whether a party was intended to be a third-party beneficiary, "doubt is construed against such intent." *See* Docket No. 107 at 9:1-4 (quoting 17B C.J.S. *Contracts* § 621 (1999)). Moreover, "the intent to benefit the third person must *clearly appear* from the terms or language of the agreement, as a whole, in light of the surrounding circumstances known to the parties, or the situation under which the contract was entered into." 17B C.J.S. *Contracts* § 621 (1999) (emphasis added).

Here, there is no clear evidence that J&CA was intended to be a third-party beneficiary of anything. J&CA's only piece of documentary evidence is an unanswered letter to Maeda that was somehow supposed to put Maeda on notice that any settlement it reached with Smithbridge would also run to J&CA. *See* Docket No. 124 at 15. There is no support in the law for this manner of creating third-party beneficiary status.

Rather, what the evidence clearly shows is that, as part of its agreement with Maeda, Smithbridge was to *help* Maeda press its claims against J&CA. For example, the Minutes clearly show that the mutual understanding of Smithbridge and Maeda was that Smithbridge would "assist" and "support [Maeda] in any suit *against others* for the collapse of the tank roof." Docket No. 101, Exh. A. As Maeda's counsel stressed during the hearing, the plural word "others" is key: the only other entities working on the Project were J&CA and GMP, so the word "others" necessarily embraces them both. February 4, 2010 Hearing. The Minutes also contemplate Maeda bringing a "million[-]dollar insurance claim against their tank designer," who, by the very terms of the Project, is J&CA. Docket No. 101, Exh. A. In short, the Minutes clearly show that the Smithbridge-Maeda settlement was *not* "made expressly for the benefit of" J&CA. 18 G.C.A. § 85204.

Thus, J&CA is not a third-party beneficiary of the Smithbridge-Maeda settlement.

## VI. CONCLUSION

For the foregoing reasons, the court hereby **GRANTS** the Smithbridge motion but **DENIES** the J&CA motion, insofar as they seek approval of any purported good-faith settlement of claims. The court will resolve the remaining parts of the J&CA motion forthwith.

**SO ORDERED**.



/s/ Frances M. Tydingco-Gatewood
    Chief Judge
Dated: Feb 23, 2010