**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF GUAM**

| | |
|---|---|
| **MAEDA PACIFIC CORPORATION**, <br><br>    Plaintiff, <br><br> vs. <br><br> **GMP HAWAII, INC.,** *et al.***,** <br><br>    Defendants, <br><br> **AND DERIVATIVE AND OTHERWISE RELATED LITIGANTS**. | Civil Case No. 08-00012 <br><br> **ORDER RE: MAEDA AND J&CA GOOD-FAITH SETTLEMENT** |
| **GMP HAWAII, INC.,** *et al.* <br><br>    Plaintiff, <br><br> vs. <br><br> **LEXINGTON INSURANCE COMPANY,** <br><br>    Defendant. | Civil Case No. 11-00010 |

1  Before the court is a Motion for Approval of Good-Faith Settlement ("the Motion") filed by
2  Jorgensen and Close Associates, Inc., U.S. Specialty Insurance Company, and Maeda Pacific
3  Corporation. *See* Docket No. 208. After hearing from the parties, and reviewing the relevant filings,
4  cases, and statutes, the court hereby **GRANTS** the Motion and issues the following opinion.
5  //

# I. FACTUAL BACKGROUND

## A. THE PROJECT

Plaintiff Maeda Pacific Corporation ("Maeda") entered into a contract with the Naval Facilities Engineering Command ("NAVFACENGCOM"), whereby Maeda agreed to build an off-site water supply system on Guam's Andersen Air Force Base. *See* Docket No. 54 at ¶ 8; *id.*, Exh. A at 1. This Maeda-Navy contract is hereinafter called the "primary contract," and the overall project it contemplates is hereinafter called "the Project."

In connection with its duties under the primary contract, Maeda entered into some sub-contracts. One such sub-contract was with GMP Hawaii, Inc. ("GMP"). *See* Docket No. 54, Exh. A at 1. Maeda and GMP disagree over the exact scope of this contract. Maeda contends that GMP agreed to design the large water reservoir tank contemplated by the primary contract, and to use "its best professional skill and knowledge to prepare the Plans and Specifications and other information, and the ultimate design for said tank." Docket No. 54 at ¶ 14. GMP denies these allegations. *See* Docket No. 16, at ¶ 12.[1] Specifically, GMP states that it agreed "to provide construction quality control management, and design engineering for the Project," but that these responsibilities "did not include design of the water storage tank, and [that] the compensation paid to GMP under that contract did not include design of the water storage tank." Docket No. 98 at ¶¶ 2, 4. The actual contract simply appears to call for "DESIGN," "QUALITY CONTROL," and "VALUE ENGINEERING." Docket No. 54, Exh. A at 1; Docket No. 98, Exh. A at 1 (same document). At any rate, the price of that contract, after a few change orders, was $1,555,966.70. Docket No. 54 at ¶ 9.

Another of Maeda's sub-contracts was with Smithbridge Guam, Inc. ("Smithbridge"). As with the Maeda-GMP contract, Maeda and Smithbridge appear to disagree over the exact scope of their contract. Maeda contends that Smithbridge agreed to build the reservoir tank and its

---

[1] On March 10, 2009, Maeda and GMP stipulated that GMP's October 14, 2008 answer to the initial Complaint would constitute GMP's Answer to Maeda's First Amended Complaint. *See* Docket No. 60.

"appurtenant sections." Docket No. 54 at ¶ 10. Smithbridge appears to deny this, insofar as it asserts that "'tank appurtenances' . . . [were] outside Smithbridge's contractual scope of work." Docket No. 71, Exh. 2 at 1. *See also* Docket No. 92, Exh. A, Exh. 3 at 2-4.

In connection with the just-discussed Maeda-Smithbridge sub-contract, Smithbridge entered into a contract with Jorgensen & Close Associates, Inc. ("J&CA") for structural engineering design services. *See* Docket No. 82, Exh. A. Specifically, J&CA's work was to include (1) structural design and drawings for the membrane floor and "precast-prestressed" wall of the reservoir tank; (2) a review of the roof and column design and drawings prepared by Smithbridge; (3) internet consultations, a shop drawing review, and up to two field observation trips to Guam; and (4) any other services requested by Smithbridge and agreed to by J&CA. *Id*.

On July 12, 2007, the roof of the reservoir tank collapsed. *See* Docket No. 54, Exh. B at 3. There is controversy over the cause of the collapse. For example, Maeda contends that the collapse was caused by the absence of vents, ventilating systems or ventilators in the tank.[2] *See* Docket No. 54 at ¶¶ 20-21; *see also id*., Exh. B (expert report prepared by Wiss, Janney, Elstner Associates, Inc., for Smithbridge). However, GMP points out that NAVFACENGCOM commissioned its own forensic study of the incident, and that this study came to the conclusion, GMP contends, that "operational errors could have been the cause for the collapse." Docket No. 98 at ¶ 18; *see also id.*, Exh. G (expert report prepared by Weidlinger Associates Inc. for NAVFACENGCOM). More to the point, and separate from the controversy over the cause of the collapse, there is controversy over who bears responsibility for whatever caused the collapse. That controversy over responsibility is the heart of this lawsuit.

**B.  RESPONSIBILITY FOR OMISSION OF WATER TANK VENTS**

As discussed previously, one theory for the collapse of the roof was the absence of vents in the tank. The parties have completed discovery and more facts have developed in regard to who was

---

[2] It is undisputed that ventilation details were omitted in the civil drawings for the water tank. However, the parties do dispute who was responsible for including the details and for ensuring that the drawings conformed to the specifications of the Project contract. *See* discussion *infra*.

Page 3 of 20

responsible for the omission of vents in the final tank drawings.

### 1. Dr. Melnyk Correspondence and Testimony

Peter Melnyk, Ph.D., P.E. ("Dr. Melnyk") is the Executive Vice President of GMP. *See* Dr. Melnyk Depo. Tr., Exh. 49 ( Docket No. 223). GMP was the lead design firm and Dr. Melnyk was the design engineer of record for the Project. *Id.* at 16.

Dr. Melnyk sent a memorandum, dated August 10, 2004, to representatives from J&CA and Smithbridge. *See id.*, Exh. 20; *see also* Docket No. 209 at 3:19-21. Among other things in the memorandum, Dr. Melnyk stated, "we [GMP, that is] will show hatch, ventilator, and ladder details in our civil drawings. Ventilator opening was provided last Thursday." Dr. Melnyk Depo. Tr., Exh. 20. As stated in the memorandum, GMP showed hatch and ladder details in their civil drawings. *Id.* at 81. However, GMP failed to include ventilator details in their drawings, and Dr. Melnyk could not recall why the ventilator details were omitted. *Id.*

On September 2, 2004, in an email chain that included J&CA and Smithbridge representatives, Dr. Melnyk again indicated that GMP would include the ventilator details: "Could you email me an advance copy of your roof plan so that we could [sic] finalize the ventilator detail on our [GMP's, that is] drawings." *Id.*, Exh. 21 at 7.

Additionally, Dr. Melnyk admitted that he reviewed J&CA's structural drawings and saw they did not include vents. *Id.* at 32–33. Specifically, in December 2004, Dr. Melnyk received J&CA's final structural drawings and a note stating: "[w]e [J&CA, that is] have completed revising these drawings and trust they are acceptable now. Let me [J&CA's Tony Galterio] know if there's anything else we need to change on the drawings." *Id.* at 92–95. Dr. Melnyk reviewed the drawings and saw that they did not include vents. *Id.* at 96. Dr. Melnyk could not recall if he responded to J&CA to ask for roof hatches and the ventilator system. *Id.* at 93. Furthermore, the drawings included a note,[3] which Dr. Melnyk read back in 2004 and interpreted to mean that J&CA's

---

[3] The note stated: "Provisions for reinforcing or framing around openings in precast concrete members and all bearing plates and corrosion-free connections shall be the responsibility of the precast concrete fabricator." Dr. Melnyk Depo. Tr. at 97.

1 drawings would not show any openings on their drawings. *Id.* at 96–99.

    Dr. Melnyk conceded that he did not instruct J&CA to include penetrations for the vents in their drawings—"I [Dr. Melnyk] guess I assumed, and maybe that's, I shouldn't have assumed, I just assumed that he [Close], that he would pick up on the fact, okay, we need these penetrations." *Id.* at 229.

    Finally, Dr. Melnyk admitted that by signing a design he had an obligation to do something if he saw inconsistencies and if there was time available to resolve the inconsistency. *Id.* 233. In regard to the roof vents, there was time available to resolve the inconsistency. *Id.*

### 2. Close Testimony

    Steven R. Close ("Close") is a structural engineer for J&CA. *See* Close Depo. Tr. at 23 (Docket No. 232, Exh. 1). Close was aware of the minimum drawing content requirements for the Project and knew that the structural design requirements applied to J&CA's structural drawings for the water tank. *Id.* at 76–77. The structural requirements included a "foundation plan" that was to "indicate," among other things, all "openings." *Id.*, Exh. 4 at 7. The J&CA drawings "provided for how to do the structural design around any openings that might be necessary, but the actual locations of the openings were coordinated on other plans." *Id.* at 79. That is, "the actual location of [the] opening would be shown on . . . the civil drawings." *Id.* at 81.[4]

---

[4] As excerpted from Close's deposition transcript:

Q. So these general specs here that were provided to you at the beginning of this process, you don't believe that you have an obligation to produce drawings in accordance with these specifications?

A. In general accordance, yes, the structural design should meet the general accordance [*sic*, probably should be "specifications"], but there are lots of things in here that don't end up on the [structural] drawings as they are either provided for in other drawings or are materials that are not applicable. So there are many things in here that says that I should have on the drawings that are not on the drawings. You want to go through them?

Q. Sure. What here that is applicable to your structural drawings do not appear on your structural drawings?

A. Okay. It says I should show piers. I didn't show any piers. It says I should show

1       Close was also responsible for incorporating Smithbridge's roof drawings into the J&CA
structural drawings. *Id.* at 61–62. Close stamped the structural drawings after said incorporation,
thus indicating that the roof drawings were properly incorporated and that the drawing met the
structural design criteria for the Project. *Id.* at 63–65. However, stamping the drawings did not
necessarily indicate that he "approved" of the Smithbridge drawings. *Id.* at 61–62.

      Additionally, Close performed quality control review of the structural drawings, but he did not review the *civil* drawings to see if they had the required holes. *Id.* at 207; *see also* Melnyk Depo. Tr. at 236–37 (corroborating that J&CA did not review GMP's drawings). Close did, however, review the roof drawings and was aware that they did not show ventilator openings, but he did not point out this omission. *See* Close Depo. Tr. at 195–97. Close was part of the committee that developed the American Water Works Association ("AWWA") D115 design specifications, which was the standard used for the water tank at issue here. *Id.* at 22–23; *see also* Docket No. 231 at 5. Thus, Close was quite familiar with the D115 specifications and it can be inferred that he should have known that the roof needed ventilation openings.

### 3. **Taitano Testimony**

While Close may have been responsible for quality control review of structural drawings, John Taitano ("Taitano") was the quality control manager for the Project and employed by GMP. *See* Taitano Depo. Tr. at 80 (Docket No. 218, Exh. 5). As the head of quality control, Taitano was

---

> foundation walls. I didn't show any foundation walls. It says I should show grade beams. I didn't show any grade beams. So there are no pits, to my knowledge, trenches. I don't believe I showed the elevations. I believe those are shown on other drawings. There would be many things that in general might be shown on such drawings, but I did not provide, and had no obligation to provide.
>
> Q. Why do you think that you didn't have an obligation to provide those details?
>
> A. To the extent they were applicable in this particular case, we—coordinating with the engineer of record [Dr. Melnyk], they were provided on other . . . [drawings, presumably].

Close Depo. Tr. at 84–85. That ventilation details would not be shown on structural drawings is corroborated by the correspondence from Dr. Melnyk and his deposition.

1 required to review *all* submittals and "check and coordinate each submittal with requirements of the
2 work and contract documents." *Id.* at 79.

3 Taitano also corroborated the fact that Dr. Melnyk was the lead designer on the Project and
4 the fact that Dr. Melnyk signed off on the final drawings for the Project. *Id.* at 23.

### 4. Amar Testimony

Nonie Amar ("Amar") was employed by Maeda and served as Maeda's point of contact for GMP. *See* Amar Depo. Tr. at 57(Docket No. 218, Exh. 6). Smithbridge submitted its water tank designs to Amar, and Amar passed the Smithbridge plans along to GMP. *Id.* at 57, 59. As the engineer of record for the Project, GMP had to review the plans. *See id.* at 59. After GMP reviewed the Smithbridge plans, Maeda submitted the plans to the Navy. *Id.*

### 5. Expert Reports

J&CA's expert, Tor Gudmundsen ("Gudmundsen"), concluded that: (1) Maeda, as the Prime Contractor, "had overall responsibility to design and construct the project to meet the RFP requirements," and that Maeda "did not complete limited design review and coordination checks during the design"; (2) GMP, as the civil engineer on the Project, was responsible for "[p]roviding the design and details for the reservoir vents[,]" and "confirmed this responsibility and their intent to show the vents on their plans in 2-emails to team members"; and (3) J&CA, as the "structural engineers for the reservoir, their focus only on the structure and not minor appurtenances matches common practice," and any doubt about who was responsible for including vents was "eliminated by GMP confirming their intent to show the vents on the plans." *Id.* at 6–7.

GMP's expert, Dr. William Ibbs ("Dr. Ibbs"), concluded, among other things, that: (1) J&CA and Smithbridge were primarily liable for the omission of vents in the tank roof, (2) Maeda was secondarily liable, and (3) GMP was not liable.[5] *See* Docket No. 286, Exh. 1 at 2–3, 8.

Maeda's expert, Duane L.N. Lee, Ph.D. ("Dr. Lee"), responded to Gudmundsen's expert

---

[5] The court notes that GMP did not file a copy of its expert report until September 9, 2011—after briefing on the issue of good faith was completed and after the hearing on the Motion. *See* Docket No. 286.

report and Dr. Ibbs's report. Maeda rebutted Dr. Lee's report and asserted that "Maeda was not responsible for confirming that the RFP design requirements were met[; rather,] Maeda ceded this responsibility to GMP and relied entirely on GMP's design expertise in submitting the final design package to the Navy." Docket No. 246, Exh. B at 6. Dr. Lee ultimately concluded that GMP was primarily responsible[6] for the omission of the vents and that J&CA also bore some responsibility for the omission:

> The record is clear that GMP, as civil designer, understood that it would need to coordinate the reservoir tank's structural drawings with its own civil drawings for the tank's layout and piping scheme. GMP indicated through Dr. Peter Melnyk that it would "show hatch, vent and ladder details in [GMP's] civil drawings" and requested copies of the reservoir tank's structural drawings so GMP could "finalize the vent detail" in GMP's civil drawings.
>
> Although GMP had indicated that the vents were part of the civil design, GMP did effectively put Jorgensen & Close on notice that (l) vents would need to be included in the tank design drawings and shop drawings; and (2) [J&CA] structural design would need to be coordinated with GMP's civil drawings to ensure that both accounted for the vents. Steve Close also knew, independently by virtue of his alleged expertise in the design of concrete pre-stressed water tanks and authorship of professional design standards for the same, that the tank would require proper venting.
>
> Thus, although GMP is primarily responsible for the failure to ensure that the tank contained proper ventilation, [J&CA] shares in that responsibility because Steve Close holds himself out as an expert in the type of tank used, was aware of general venting requirements for the type of tank used, was aware of GMP's intention to include vents in the tank roof, and failed at several stages of the Project (review of Smithbridge initial design drawings, coordination with civil drawings, review of shop drawings, etc.) to discover and alert Smithbridge, Maeda, the Navy or any other involved party of the absence of proper venting.
>
> . . .
>
> GMP was, . . responsible for designing civil elements of the reservoir tank and the water system in general to ensure that the system would operate properly. To the extent those civil elements required vents in the tank roof - which they clearly did based on Melnyk's indication that he would include vents in the roof design, GMP was responsible for design of the same.

*Id.*, Exh. B at 1–2 (first alteration in the original) (footnotes omitted).

//

---

[6] Dr. Lee described Dr. Ibbs's report as "strained in its attempt to shift blame away from GMP," and rebutted each of his eleven conclusions. Docket No. 246, Exh. B at 1.

C. **MAEDA-J&CA SETTLEMENT AGREEMENT**

In April 2011, Maeda and J&CA entered into a settlement agreement (the "Maeda-J&CA settlement"), contingent upon a finding of good faith by the court. *See* Docket No. 210 at ¶ 3. The Maeda-J&CA settlement provides that Maeda will "release [J&CA] from any and all liability arising out the conduct that forms the basis of the Complaint for a payment of $250,000.00." *Id.*

**II. PROCEDURAL BACKGROUND**

**A. THE COMPLAINT, ANSWERS, CROSS-CLAIMS, THIRD-PARTY COMPLAINT, AND FAC**

Maeda initiated this case by filing its initial complaint on August 14, 2008. *See* Docket No. 1. The defendants named in the initial complaint were: GMP; Ohio Pacific Tech, Inc. ("Ohio Pacific"), an Ohio corporation doing business as GMP Associates, Inc.; GMP Associates, Inc.; and J&CA. *Id.*

On October 14, 2008, GMP and Ohio Pacific answered the complaint, and brought a counterclaim for breach of contract against Maeda, and a cross-claim for contribution against J&CA. *See* Docket No. 16. That same day, GMP and Ohio Pacific also brought a third-party complaint for contribution against Smithbridge. *See* Docket No. 17.

On November 3, 2008, Smithbridge answered the third-party complaint, and brought a counterclaim against GMP and Ohio Pacific, as well as a cross-claim for breach of contract against J&CA. *See* Docket No. 25. That same day, J&CA answered the GMP and Ohio Pacific cross-claim, and brought its own cross-claims for contribution and equitable indemnity against GMP and Ohio Pacific. *See* Docket No. 26.

On November 24, 2008, J&CA answered the Smithbridge cross-claim, and brought its own cross-claims for contribution and equitable indemnity against Smithbridge. *See* Docket No. 31.

On February 24, 2009, Maeda filed its First Amended Complaint ("FAC"), the now-operative complaint. *See* Docket No. 54. The defendants named in the FAC are: GMP; Ohio Pacific; Lexington Insurance Company, the insurers of GMP and Ohio Pacific; J&CA; and U.S.

Specialty Insurance Company ("Specialty"), the insurers of J&CA. *Id.* In the FAC, Maeda alleges one count of negligence and one count of breach of contract against all defendants and prays for damages in the amount of $6 million ($1 million of which is claimed as liquidated damages). *See id.* at ¶¶ 19–25. Maeda also alleges one count of breach of contract specifically against GMP and prays for damages in the amount of $1.8 million. *See id.* at ¶¶ 26–28.

### B.   MAEDA-SMITHBRIDGE GOOD-FAITH SETTLEMENT

On August 14, 2009, Smithbridge filed an Alternative Motion for Summary Judgment, or Approval of Good-Faith Settlement, for Dismissal of the Third-Party Complaint. *See* Docket No. 69. On February 23, 2010, the court found that a covenant not to sue, under which Maeda promised not to sue Smithbridge and in turn Smithbridge gave Maeda a discount of $122,065.81 discount for services rendered, constituted a settlement between Maeda and Smithbridge. *See* Docket No. 167. The court further found that the settlement—i.e., the promise not to sue for the $122,065.81 discount—was made in good faith. *See id.* The court, however, declined to find that J&CA was a third-party beneficiary of the good faith settlement. *See id.*

### C.   J&CA MOTION FOR SUMMARY JUDGMENT; CERTIFIED QUESTION

On September 10, 2009, J&CA and Specialty filed a Motion for Summary Judgment. *See* Docket No. 80. The court determined that whether Maeda could pursue a negligence claim against J&CA turned on whether the economic loss doctrine applies on Guam, and if so, to what extent.[7] The Guam courts were silent on the issue, and given its importance in light of the impending

---

[7] The economic loss doctrine bars recovery for purely economic losses when there is no physical harm to plaintiff (or his property). The reasoning is that plaintiff's remedy lies more appropriately in contract law because his actual claim is that he did not receive the benefit of the bargain. *See* Anthony L. Meager & Michael P. O'Day, *Who Is Going to Pay for My Impact—A Contractor's Ability to Sue Third Parties for Purely Economic Loss*, 25 Constr. Law. 27, 27 (2005).

J&CA argues that Maeda's negligence-based claims against it are barred by the economic loss doctrine, and that Maeda may only seek relief under the contracts and sub-contracts associated with the Project. While many districts apply the economic loss doctrine, its scope varies and there is a split in authority as to whether it applies to design professionals like engineers. *See id.* at 28. If the Guam Supreme Court decides that the economic doctrine applies on Guam and that it extends to design professionals, then Maeda cannot maintain a negligence claim against J&CA.

1 military buildup and accompanying construction activity, the court certified the economic loss
2 doctrine question to the Supreme Court of Guam on April 1, 2010. *See* Docket No. 181.

3 On August 6, 2010, the court granted J&CA's Motion for Summary Judgment, but only as
4 to the contract claim. *See* Docket No. 203. In light of the certified question, the court vacated the
5 trial and all concomitant conference dates, to be rescheduled after the certified question is answered.

6 The Supreme Court of Guam has yet to answer the certified question. The parties agree that
7 the economic loss doctrine should apply in some respect on Guam, but how it is applied will
8 determine whether Maeda can pursue its negligence claim against J&CA. As it stands now, Maeda
9 is pursuing two counts of breach of contract against GMP and one count of negligence against GMP
10 and J&CA.

### D. MAEDA-J&CA MOTION FOR APPROVAL OF GOOD FAITH SETTLEMENT

13 On April 20, 2011, Maeda and J&CA jointly filed a Motion for Approval of Good-Faith
14 Settlement ("the Motion"). *See* Docket No. 208. On May 4, 2011, GMP filed an Opposition to the
15 Motion. *See* Docket No. 214. On May 10, 2011, Maeda and J&CA filed their Reply. *See* Docket
16 No. 217. On May 13, 2011, the court found that GMP had the burden of demonstrating the lack of
17 good faith and ordered GMP to file a supplemental brief to support its position. *See* Docket No. 224.
18 GMP filed its supplemental brief on May 27, 2011. *See* Docket No. 231. Maeda and J&CA filed
19 their supplemental reply on June 2, 2011. *See* Docket No. 245.

20 The court heard oral argument on the Motion on September 6, 2011. *See* Docket No. 281.
21 After the hearing, and as directed by the court, J&CA filed a copy of its insurance policy and a
22 declaration from Close regarding the value of J&CA's assets. *See* Docket No. 284. GMP filed its
23 response to J&CA's filings on September 9, 2011, and included a copy of its expert report. *See*
24 Docket Nos. 285, 286.

### III. JURISDICTION AND VENUE

26 All of Plaintiff's causes of action are within the court's diversity jurisdiction. *See* 28 U.S.C.

Page 11 of 20

Case 1:08-cv-00012 Document 288 Filed 09/23/11 Page 11 of 20

§ 1332; *see also* Docket No. 54 at ¶¶ 1–7.

Venue is proper in this judicial district, the District of Guam, because Defendants conduct business here, and because all of the events or omissions giving rise to Plaintiff's claims occurred here. *See* 28 U.S.C. § 1391.

## IV. APPLICABLE STANDARDS

Section 24606(b) of Title 7 of the Guam Code Annotated, provides that "[t]he issue of the good faith of the settlement may be determined on the basis of affidavits served with the notice of hearing, any counter-affidavits filed in response thereto, and any evidence presented at the hearing."[8] 7 GUAM CODE ANN. § 24606(b). If the court determines that a settlement is made in good faith, joint tortfeasors will be barred from making claims of contribution against the settling tortfeasor. *Id.* § 24606(c).

The party asserting the lack of good faith shall have the burden of proof on that issue, except if the issue is raised by a party to the settlement, in which case the burden of proof shall be on the proponent. *Id.* § 24606(d). In this case, the parties to the settlement—Maeda and J&CA—assert that the settlement was made in good faith. GMP, a non-party to the settlement, however, alleges that the settlement lacks good faith, and thus bears the burden of demonstrating such. *See id.*; *see also N. Cnty. Contractor's Ass'n v. Touchstone Ins. Servs.*, 33 Cal. Rptr. 2d 166, 169 (Cal. Ct. App. 1994) ("The burden is upon the party objecting to the proposed settlement to prove an absence of good faith.").

A settlement is not in good faith "if it is made for significantly less than the reasonable value of the claim for which it is made taking into account the likelihood of liability, assets and insurance available to pay the claim, the cost and difficulty of pursuing the claim, the relationship between the parties to the settlement, and such other factors as the court may deem appropriate or relevant." 7 GUAM CODE ANN. § 24606(e).

---

[8] The nature and extent of the hearing is left to the trial court's discretion. *Franklin Mint Co. v. Superior Court (Shook)*, 31 Cal. Rptr. 3d 319, 324 (Cal. Ct. App. 2005).

Page 12 of 20

Case 1:08-cv-00012 Document 288 Filed 09/23/11 Page 12 of 20

As the court has previously stated, there do not appear to be any Guam cases interpreting or applying Section 24606, and as such it is appropriate for the court to look to California cases to interpret Section 24606. *See* Docket No. 167 at 11. The leading California case, *Tech-Bilt, Inc. v. Woodward-Clyde & Associates*, provides that the good faith inquiry should turn on:

> . . . [(1)] a rough approximation of plaintiffs' total recovery and the settlor's proportionate liability, [(2)] the amount paid in settlement, [(3)] the allocation of settlement proceeds among plaintiffs, and [(4)] a recognition that a settlor should pay less in settlement than he would if he were found liable after a trial. Other relevant considerations include [(5)] the financial conditions and insurance policy limits of settling defendants, as well as [(6)] the existence of collusion, fraud, or tortious conduct aimed to injure the interests of nonsettling defendants. Finally, practical considerations obviously require that the evaluation be made on the basis of information available at the time of settlement.

698 P.2d 159, 166–67 (Cal. 1985) (citation omitted).

When applying the *Tech-Bilt* factors, there are no firm guidelines, and "each case must be evaluated on its unique facts." *Erreca's v. Superior Court (Midlam)*, 24 Cal. Rptr. 2d 156, 173 (Cal. Ct. App. 1993). Thus, the court has wide discretion to determine whether a settlement is made in good faith, with the decision ultimately turning on "whether the settlement is grossly disproportionate to what a reasonable person at the time of settlement would estimate the settlor's liability to be." *City of Grand Terrace v. Superior Court (Boyter)*, 238 Cal. Rptr. 119, 126 (Cal. Ct. App. 1987); *see also* Emery J. Mishky et al., *California Code of Civil Procedure Sections 877, 877.5 and 877.6: The Settlement Game in the Ballpark that Tech-Bilt*, 13 PEPP. L. REV. 823, 838 (1985–1986).

The court also bears in mind that its decision should account for the dual policy goals of the good faith statute: (1) "the encouragement of settlements," and (2) "the equitable allocation of costs among multiple tortfeasors." *Tech-Bilt*, 698 P.2d at 166.

**V.    ANALYSIS**

Maeda and J&CA entered into a settlement agreement under which J&CA will pay $250,000 to Maeda, and in turn Maeda will release J&CA from liability under the FAC. *See* Docket No. 208. The settling parties request that the court declare that the settlement was made in good faith. GMP

1 alleges that the settlement was made in bad faith. *See* Docket Nos. 214, 231. As just discussed, to resolve the dispute, the court must look at the *Tech-Bilt* factors to determine "whether the settlement is grossly disproportionate to what a reasonable person at the time of settlement would estimate [J&CA's] liability to be." *City of Grand Terrace*, 238 Cal. Rptr. at 126.

GMP, the party asserting bad faith, has the burden of proof on the issue. To satisfy that burden, GMP must show that "the settlement is so far 'out of the ballpark' in relation to [the *Tech-Bilt*] factors." *Tech-Bilt*, 698 P.2d at 167. However, a "challenge to the [settlement] agreement's assigned value should not be interpreted as giving the challenging defendant a right to a mini-trial on the valuation issue." *Erreca's*, 24 Cal. Rptr. 2d at 166. Looking at the applicable factors—J&CA's proportionate liability, the settlement amount, the discount for settling before trial, J&CA's financial condition, and the existence of fraud, collusion, or tortious conduct—GMP has not carried its burden of demonstrating bad faith.[9]

### A. **PROPORTIONATE LIABILITY**

First, GMP argues that the settlement does not reflect J&CA's proportionate liability. The settling defendant's proportionate liability is one of the most important factors in the good-faith analysis. *See Mattco Forge, Inc. v. Arthur Young & Co.* 45 Cal. Reptr. 2d 581, 588 (Cal. Ct. App. 1995) (quoting *Toyota Motor Sales U.S.A., Inc. v. Superior Court*, 269 Cal. Rptr. 647, 650 (Cal. Ct. App. 1990)). Accordingly, the court abuses its discretion by finding a good-faith settlement if there is not substantial evidence to support the extent of a settling defendant's liability. *See id.*

GMP argues that the settling parties have not produced sufficient evidence to demonstrate J&CA's proportionate liability to Maeda. Contrary to GMP's assertion, the settling parties have produced sufficient evidence for the court to assess J&CA's proportionate liability. Based on the

---

[9] In its briefs, GMP addressed only the first and second *Tech-Bilt* factors: J&CA's proportionate liability and the amount of the settlement. GMP's arguments regarding J&CA's financial condition and the existence of fraud, collusion, or tortious conduct were untimely as they were respectively raised at the hearing and after the hearing in a supplemental brief. *See* Docket No. 285 at 3–4.

1  evidence available at the time of the settlement, both Maeda and J&CA believed that GMP was
2  primarily responsible for the omission of ventilation details. *See* Docket No. 209 at 10. As
3  discussed in Section I *supra*, there is ample evidence in the record to support this belief, including:
4  (1) the correspondence between GMP (by way of Dr. Melnyk) to J&CA representatives in which
5  it was conveyed that GMP would include ventilation details in their drawings; (2) the testimony
6  elicited from Dr. Melnyk during his deposition; and (3) the independent expert reports from
7  Gudmundsen and Dr. Lee—both of which concluded that GMP was primarily liable for failing to
8  include ventilation details in the drawing.

9  Despite this evidence, GMP maintains that J&CA is the party primarily liable for the
10 omission of vents. Docket No. 231 at 3. This argument is unpersuasive. While Dr. Ibbs found that
11 J&CA and Smithbridge were primarily liable, Gudmundsen and Dr. Lee came to contrary
12 conclusions.[10] In fact, Dr. Lee rebutted Dr. Ibbs's's findings and described his report as "strained
13 in its attempt to shift blame away from GMP." Docket No. 246, Exh. B at 1.

14 The court finds that for purposes of the good-faith determination and based on the evidence
15 in the record at the time of settlement, that GMP was primarily liable for the omission of vents in
16 the tank. *See Tech-Bilt*, 698 P.2d at 167 (stating that court can rely on experts in the field to make
17 good faith determination). Furthermore, based on the evidence in the record, the court finds that
18 Maeda, J&CA, and Smithbridge all bore some liability for the omission. As such, the settlement
19 amount roughly approximates J&CA's proportionate liability. Thus, GMP has failed to demonstrate
20 that the settlement amount is so far out of the ballpark in relation to J&CA's proportionate liability.

21 **B.    SETTLEMENT AMOUNT AND DISCOUNT**

22 Second, GMP emphasizes that the settlement amount is only four percent of the $6 million[11]

---

[10] The court again notes that GMP did not file Dr. Ibbs's report until after the hearing. GMP had more than adequate time to file the report before then. Gudmundsen was present at the hearing on the Motion and could have presumably provided rebuttal testimony for Dr. Ibbs's conclusions if GMP had filed the report in a timely manner.

[11] Actually, Maeda can only claim $5 million against J&CA because $1 million of Maeda's claimed damages is in the form of liquidated damages. *See* Docket No. 54 at 6 ¶ 25 (claiming liquidated damages in

1 that Maeda seeks in damages. While this is true, it is not enough to establish bad faith. To satisfy
2 its burden, GMP must do more than show that "the settling defendant paid less than his theoretical
3 proportionate or fair share." *See Tech-Bilt*, 698 P.2d at 166. This makes sense because "damages
4 are often speculative, and the probability of legal liability therefor is often uncertain or remote[,]"
5 and "[s]uch a rule would unduly discourage settlements." *Id.*

6 In *Cahill v. San Diego Gas & Elec. Co.*, the trial court found that a settlement for $25,000
7 between the plaintiff and a nonparty settlor was made in good faith. *See* 124 Cal. Rptr. 3d 78, 95
8 (Cal. Ct. App. 2011). On appeal, the defendant argued that the settlement was not made in good
9 faith because $25,000 was "out of the ballpark" in relation to the settlor's potential liability in that
10 it was only .5% of the plaintiff's claimed damages of $5 million. *Id.* at 102. The court explained
11 that the plaintiff's claimed damages and the settlor's potential liability were not necessarily the
12 same, and held that the defendant failed to carry its burden of demonstrating bad faith by merely
13 pointing out the gross disparity between the settlement amount and the claimed damages. *Id.* at 102
14 n.17, 103. The court further emphasized that "each case must be decided based on its particular
15 circumstances." *Id.* at 103.

16 Like the defendant in *Cahill*, GMP cannot satisfy its burden by emphasizing the disparity
17 between the settlement amount and Maeda's claim for $6 million in damages. *See id.*; *see also*
18 *Wysong & Miles Co. v. W. Indus. Movers*, 191 Cal. Reptr. 671, 675, 679 (Cal. Ct. App. 1983)
19 (approving settlement of $65,000 where the plaintiff claimed damages of more than $7 million and
20 rejecting the challenging party's argument that a proportionately low settlement in comparison to
21 a potential damages award is per se evidence of bad faith); *Abbott Ford, Inc. v. Superior Court*
22 *(Bach)*, 741 P.2d 124, 134 (Cal. 1987) ("In order to encourage settlement, it is quite proper for a

---

the amount of $1 million contract breach). Liquidated damages are a contractual remedy, not tort. *See* BLACK'S LAW DICTIONARY (9th ed. 2009), damages (defining liquidated damages as "[a]n amount contractually stipulated as a reasonable estimation of actual damages to be recovered by one party if the other party breaches."). As such, J&CA would not be liable for liquidated damages if the case proceeded to trial because the court entered judgment in favor of J&CA on the breach-of-contract claim. *See* Docket No. 203.

settling defendant to pay less than his proportionate share of the anticipated damages."). Thus, the fact that the $250,000-settlement is only 4% of Maeda's claimed damages is not enough to demonstrate bad faith.[12]

Moreover, the settlement amount accounts for the fact that J&CA may not be liable to Maeda at all. This can happen in one of two ways: (1) if the Guam court accepts J&CA's economic loss doctrine approach, then Maeda cannot maintain the remaining negligence claim against J&CA; or (2) if the Guam court rejects J&CA's approach and the case proceeds to trial, the jury could find that Maeda's negligence was greater than J&CA's, and if so Maeda would be barred from recovering from J&CA under the doctrine of modified comparative negligence. *See* Docket No. 209 at 14–16. These facts weigh heavily in favor of finding good faith as it goes to the strength of Maeda's case against J&CA, and in turn J&CA's likelihood of liability. *See* 7 GUAM CODE ANN. § 24606(e) (stating that likelihood of liability bears on whether the settlement amount is reasonable); *see also Standard Pac. of San Diego v. A. A. Baxter Corp.*, 222 Cal. Rptr. 106, 109 (Cal. Ct. App. 1986) ("a

---

[12] J&CA and Maeda also cite a slew of cases where settlement amounts were relatively low in comparison to the amount of claimed damages:

*Yusen Air & Sea Services (Guam), Inc. v. Superior Court of Guam*, CIV. 93-00020A, 1993 WL 245645 (D. Guam App. Div., June 23,1993) (affirming approval of $100,000 settlement despite the fact that judgments for similar wrongful death claims tended to exceed $1 million); *Maeda Pac. Corp. v. GMP Hawaii. Inc.*, CIV. 08-00012, 2010 WL 672849 (D. Guam, Feb. 23, 2010) (approving Smithbridge's $122,065.81 settlement in the instant case); *Smith v. Texaco. Inc.*, 597 N.E.2d 750 (Ill. Ct. App. 1992) (affirming approval of $435,000 good faith settlement for injuries from gas tank explosion despite nonsettling joint tortfeasors' contentions that settlement was less that 4% of insurance coverage and was the not pro rata share of damages based on culpability); *Sharma v. Meyers*, 803 S.W.2d 65 (Mo. Ct. App. 1990) (upholding approval of good faith settlement of $100,000 and dismissing contribution suit although the plaintiff obtained a $2 million verdict against other joint tortfeasors); *Ballweg v. City of Springfield*, 499 N.E.2d 1373 (Ill. 1986) (upholding of $15,000 good-faith settlement approval, based on totality-of-the-circumstances test, as bar to later contribution claim based on $304,338 jury verdict); *Christmas v. Hughes*, 543 N.E.2d 274 (Ill. App. Ct. 1989) (upholding $300 settlement by joint-tortfeasor where claimant sought $15,000, the court noted that although the consideration was low in comparison, the trend is to either reject a ratio test or treat the ratio test as only one factor in determining good faith).

Docket No. 245 at 4.

Case 1:08-cv-00012 Document 288 Filed 09/23/11 Page 17 of 20

disproportionately low settlement figure might be reasonable in light of . . . the uncertainty or remoteness of legal liability.") (citing *Tech Bilt*, 698 P.2d 159 at 166). Significantly, GMP does not address the fact that Maeda may have no right to recover from J&CA at all if the Guam Supreme Court adopts J&CA's version of the economic loss doctrine, or if the case proceeds to trial and a jury finds that Maeda was more at fault than J&CA.

Furthermore, the $250,000 settlement is more than twice as much as the Maeda-Smithbridge good-faith settlement of $122,065.81. In that settlement, the court found that the amount of that settlement was reasonable because at the time of the agreement, Maeda did not think Smithbridge played a role in the collapse of the tank roof. *See* Docket No. 167 at 17. The court further found that even if Maeda believed it had a legal claim of greater than $122,065.81, the amount was in good faith because a settling defendant should pay less in settlement than if found liable at trial. *Id.* at 18. Similarly, at the time of settlement here, Maeda believed that GMP was primarily liable for the collapse, and the settlement amount of $250,000 is discounted because J&CA should pay less than if found liable at trial.

In sum, it was reasonable for the parties to believe that J&CA's potential liability was well under $6 million and that after discounting the settlement amount, $250,000 was a rough approximation of J&CA's proportionate liability. Thus, the settlement amount is not so far out of the ballpark.

### C. FINANCIAL CONDITION OF J&CA

Third, GMP argues that the financial condition of J&CA requires that the court find the settlement was not made in good faith. GMP raised the issue of J&CA's financial condition for the first time at the hearing, making it untimely. However, for the sake of thoroughness, the court entertains the argument here.

In response to GMP's argument, J&CA provided an offer of proof at the hearing of the following facts: (1) the limit of its insurance policy was $1 million, (2) its attorney's fees are included under the claims limitation, (3) up to the date of the hearing, over $220,000 in claimed

1 attorney's fees have been expended under the policy, and (4) its assets have an estimated value of
2 less than $50,000. After the hearing, J&CA filed a declaration from Close that stated the foregoing
3 facts, as well as a copy of J&CA's insurance policy. *See* Docket No. 286.

4         Based on these facts, when the amount of the settlement is added to J&CA's accrued claims,
5 nearly half of its insurance policy will be exhausted. J&CA need not exhaust its insurance limitation
6 in order for the court to find that the settlement is in good faith. Such a rule would fail to encourage
7 settlements and fail to account for the fact that the settlement amount should be discounted.
8 Additionally, if the case proceeds to trial, J&CA will continue to rack up attorney's fees and the
9 amount available to pay any judgment would continue to decrease. J&CA's assets would not cover
10 much more either, as it only has $50,000 in assets to add to the payment of any judgment. Thus, the
11 settlement amount is not so far out of the ballpark in relation to J&CA's financial condition,

12         GMP argues that the court should not consider Close's declaration regarding J&CA's
13 financial condition. *See* Docket No. 285 at 2. However, Section 24606 explicitly states that the
14 court may rely on affidavits and counter-affidavits in its good-faith determination. *See* 7 GUAM
15 CODE ANN. § 24606(b). While J&CA submitted a declaration instead of an affidavit, the court finds
16 that the declaration was made under penalty of perjury and serves the same function as an affidavit
17 in this case. *See Malty v. Ashcroft*, 381 F.3d 942, 947 n.2 (9th Cir. 2004) (treating affidavits and
18 declarations interchangeably for a motion to reopen asylum proceedings); *see also* CAL. CIV. PRO.
19 CODE § 2015.5; *Hatch v. Bush*, 30 Cal. Rptr. 397, 403 n.1 (Cal. Ct. App. 1963) (explaining that §
20 2015.5 of the California Code of Civil Procedure gives declarations made under penalty of perjury
21 the same effect as affidavits when affidavits are required by statute). The court finds that the
22 declaration is sufficient evidence of J&CA's financial condition for purposes of determining good
23 faith as Close stated that he would be competent to testify if called as a witness regarding J&CA's
24 insurance claims and its assets.

25         Furthermore, the court reminds GMP that it did not raise this issue until the day of the
26 hearing , and as such cannot now complain that the evidence is insufficient. *See Cahill*, 124 Cal.

Rptr. 3d at 104 (finding that party challenging good faith had the burden of raising the issue of settlor's financial condition and presenting evidence of such). Had GMP raised the issue in its briefs, J&CA could have responded to any challenges to the sufficiency of its evidence submitted in support of its accrued claims under the policy and the value of its assets to rebut GMP's challenges related to its financial condition.

### D. FRAUD, COLLUSION, OR TORTIOUS CONDUCT

Fourth, GMP argues that there is some fraud, collusion, or tortious conduct on the part of the settling parties. GMP raised this issue after the hearing in a response to J&CA's financial-condition declaration. *See* Docket No. 285 at 3–4. Again, the court discusses this untimely argument for the sake of thoroughness and finds that it lacks merit. There is no evidence in the record that indicates the presence of fraud, collusion, or tortious conduct in regard to the Maeda-J&CA settlement. As with the other applicable *Tech-Bilt* factors, GMP has failed to demonstrate that the $250,000 settlement is so far out the ballpark in relation to this factor.

## VI. CONCLUSION

As discussed in the foregoing, GMP fails to demonstrate that the Maeda-J&CA settlement is so out of the ballpark in relation to the *Tech-Bilt* factors, and thus fails to carry its burden of demonstrating the lack of good faith. After considering the applicable *Tech-Bilt* factors, the court finds that Maeda-J&CA settlement amount of $250,000 is not grossly disproportionate to what a reasonable person would estimate J&CA's liability to be at the time of the settlement; rather, $250,000 is a reasonable estimate of J&CA's liability to Maeda.

Furthermore, a finding of good faith in this case would further the statute's policy goals of encouraging settlements and ensuring equitable distribution of costs among tortfeasors. Accordingly, the court hereby **GRANTS** the Motion and finds that the Maeda-J&CA settlement was made in good faith under Section 24606 of Title 7 of the Guam Code Annotated.

**SO ORDERED.**



/s/ Frances M. Tydingco-Gatewood
Chief Judge
Dated: Sep 23, 2011